UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| MIDHAT PAWLAK,<br>8623 Hempstead Avenue<br>Bethesda, MD 20817<br><br>                Plaintiff,<br><br>        v.<br><br>MATTHEW P. LYNCH<br>1401 Meadowood Lane<br>Charlotte, NC 28211<br><br>    and<br><br>DISTRICT CAPITAL PARTNERS<br><br>                Defendants.<br>  Serve:<br>  Kevin Carroll & Amina Hassan,<br>  Hughes Hubbard & Reed LLP<br>  1775 I Street, N.W., 6th Floor<br>  Washington, DC 20006, | Case No._____<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

In March 2021, Plaintiff Midhat Pawlak was hired by Defendant District Capital Partners to fill the role of Managing Director of Operations. Founder and Managing Director Matthew P. Lynch interviewed and hired Ms. Pawlak. More than 20 years earlier, Ms. Pawlak and Mr. Lynch were in a short-lived romantic relationship. Despite their past relationship, Mr. Lynch and Ms. Pawlak initially had no personal conflicts while working together at DCP. But as time went on, Mr. Lynch made Ms. Pawlak increasingly uncomfortable by incessantly reminiscing about their prior relationship. Mr. Lynch also relentlessly pried into Ms. Pawlak's personal life, putting an emphasis on "vulnerability-based trust," and forcing her to discuss personal struggles related to her mental health and marital issues at their many mandatory one-on-one meetings. Then, Mr. Lynch used

information he gained from these discussions to manipulate Ms. Pawlak and criticize her performance.  Mr. Lynch constantly pressed Ms. Pawlak to engage in these reminiscing conversations with him.  When she did not play along to his satisfaction, he reduced her job duties and terminated her.

Mr. Lynch expected Ms. Pawlak to perform whatever duties DCP needed done, whether they were listed in her position description or not. He never clearly communicated how Ms. Pawlak should prioritize her assignments and constantly shifted his performance expectations, imploring Ms. Pawlak to focus less on "Administrative" tasks—including Human Resources and Employee Personnel issues. In or about the first week of April 2024, while Ms. Pawlak was out of the office on scheduled leave, Mr. Lynch sent her a document detailing a restructuring of her position, removing the majority of her existing duties. Mr. Lynch then asked Ms. Pawlak to think about what other responsibilities she could take on. When Ms. Pawlak returned from leave on April 8, 2024 and throughout that week, she led DCP through a transition to a new IT service provider.  During their following mandatory meeting on April 16, 2024, having been busy with the IT project the week prior, Ms. Pawlak requested additional time to review the document and provide Mr. Lynch with her thoughts about the changes to her responsibilities. That afternoon, Mr. Lynch terminated Ms. Pawlak's employment over the telephone, blindsiding her.

Ms. Pawlak seeks damages for her emotional pain and suffering and backpay from the date of her termination.

**PARTIES**

1. Plaintiff Midhat Pawlak ("Ms. Pawlak") is a resident of the state of Maryland who, until April 16, 2024, was employed by Defendants as a Managing Director of Operations.

2. Defendant District Capital Partners ("DCP") is a District of Columbia corporation with

its principal place of business in the District of Columbia.

3. Defendant Matthew P. Lynch is the Founder and Managing Director of DCP and is personally liable as Plaintiff's employer within the meaning and subject to the requirements of DC Code § 2–1401.02(10).

## JURISDICTION AND VENUE

4. Jurisdiction is proper pursuant to 28 U.S.C. § 1332(a)(1) and 28 U.S.C. § 1367.

5. Venue is proper pursuant to 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f)(3) because the underlying events occurred in D.C.

## STATEMENT OF FACTS

### *Background*

6. Ms. Pawlak began working for DCP as the Managing Director of Operations in March of 2021.

7. Ms. Pawlak was exceptionally qualified for the job, as she has worked in the investment banking and private equity fields for the last 24 years and spent the last seven years managing business operations.

8. Ms. Pawlak was hired at DCP directly by Founder and Managing Director Matt Lynch.

9. Mr. Lynch and Ms. Pawlak were involved in a relationship for a few months more than 20 years prior.

10. Despite their past relationship, Mr. Lynch and Ms. Pawlak initially had no personal conflicts while working together at DCP.

11. During Ms. Pawlak's tenure at DCP, she successfully completed significant strategic projects.

12. Throughout 2021, Ms. Pawlak's first year at DCP, she realigned various internal committees and solely took on many responsibilities that had been previously shared

by multiple officers and team members.

13. For example, Ms. Pawlak took over leading the company's recruiting committee, facilitated the onboarding of new employees, and created the company's employee handbook.

14. Ms. Pawlak was also responsible for DCP's marketing, including managing the website, posting on the company's social media pages, and managing the creation of promotional items for clients.

15. Ms. Pawlak was responsible for managing Human Resources for the company. On Saturday, June 26, 2021, Mr. Lynch called Ms. Pawlak with the devastating news that a DCP analyst had passed away. Mr. Lynch described it as suicide and the analyst had jumped off an apartment building roof.

16. Mr. Lynch was on vacation while Ms. Pawlak communicated with the deceased family as the firm's representative and provided support to all employees. Mr. Lynch commended her ability to lead during this highly traumatic situation.

17. Then, during Ms. Pawlak's second year at DCP, she relocated the entire firm twice – once to a temporary space while DCP's new office was under construction and then into the new office space.

18. Ms. Pawlak had administrative access to all IT and security-related systems, managing their configuration and overseeing day-to-day troubleshooting and maintenance.

19. In 2023, Ms. Pawlak was instrumental in setting up a new business division for DCP with Sundance Partners.

20. Ms. Pawlak functioned as the Head of Operations for Sundance, as well as coordinating all investor relations. In this role, Ms. Pawlak provided crucial research through access to her connections and set up a comprehensive fundraising database.

21. When Ms. Pawlak attended an investor conference later that year with some of her colleagues, including Mr. Lynch, they all noted Ms. Pawlak's successful efforts with Sundance.

### *Lynch Begins Making Romantic Overtures to Ms. Pawlak*

22. As time went on, Mr. Lynch's behavior made Ms. Pawlak increasingly uncomfortable.

23. On March 31, 2022, DCP held a social event. After the event, Mr. Lynch asked Ms. Pawlak to accompany him to the Ritz Carlton hotel, where he was staying, for a night cap.

24. Mr. Lynch made a point of noting that he did not want anyone to see the two of them going into the hotel together.

25. Ms. Pawlak found this comment strange, as she and Mr. Lynch had been discussing work matters for the last several hours, including background on DCP's Human Resources and other Managing Directors.

26. Nevertheless, Ms. Pawlak believed this meeting would provide her with an opportunity to speak with Mr. Lynch about how to be successful in her position, so she accompanied him to the hotel.

27. During their conversation, Mr. Lynch inappropriately reminisced on their prior relationship, asking if Ms. Pawlak remembered how they used to kiss.

28. Ms. Pawlak was uncomfortable with Mr. Lynch's romantic advances and redirected the conversation to business matters.

29. Wanting a sense of closure, Ms. Pawlak asked Mr. Lynch why their relationship ended 20 years ago.

30. Her recollection was that, after dating for a few months and flying from her home in Virginia to visit Mr. Lynch in California, he abruptly stopped speaking to her after

5

she experienced a panic attack at his home.

31. During the panic attack, she had explained to Mr. Lynch that she had been sexually assaulted in the past and was still dealing with anxiety and panic surrounding the traumatic experiences.

32. Later, Mr. Lynch would use this extremely personal information about Ms. Pawlak's assaults, which he learned 20 years earlier during their romantic relationship, to manipulate Ms. Pawlak and point to her trauma as a performance deficiency.

33. Ms. Pawlak was hurt by the way Mr. Lynch ended the relationship, and although she had long since moved on and married her husband, she wanted to hear Mr. Lynch out so they could continue working together amicably.

34. Mr. Lynch apologized and explained that it was an immature decision to cut Ms. Pawlak off like that, which he made 20 years ago as a "young, dumb, Matt."

35. Mr. Lynch then asked if Ms. Pawlak's husband was aware of her prior relationship with Mr. Lynch and noted that his own wife was not aware.

36. Ms. Pawlak answered honestly that she had not yet told her husband and Mr. Lynch asked that she give him prior notice before she did so.

37. Ms. Pawlak left the meeting with Mr. Lynch at the Ritz feeling extremely uncomfortable and unsettled.

38. Ms. Pawlak ignored Mr. Lynch's request and informed her husband. It is unclear whether Mr. Lynch ever informed his wife.

### *Lynch Pries into Ms. Pawlak's Personal Life*

39. Throughout Ms. Pawlak's tenure at DCP, Mr. Lynch constantly attempted to pry into her personal life, sometimes using knowledge he gained during their previous romantic relationship and holding it over Ms. Pawlak.

40. In meetings with other employees and outside partners, Mr. Lynch would often say

things like "Mid and I have been friends for a long time, that's why I brought her on," constantly reminding her of their previous relationship and insinuating that this was the reason she had a job.

41. Ms. Pawlak resisted Mr. Lynch's nostalgic reminiscence of their previous relationship by changing the discussion topic to their substantive work at DCP.

42. Mr. Lynch exhibited a leadership style using what he called "vulnerability-based trust," which purportedly allows people to be open and honest with each other, without fear of judgment or retaliation.

43. Mr. Lynch used this strategy to force Ms. Pawlak to open up to him and be vulnerable.

44. Mr. Lynch would frequently pry about Ms. Pawlak's husband and how he and his business were doing.

45. In May of 2022, when Mr. Lynch was prying about Ms. Pawlak's personal life, in a vulnerable moment she disclosed difficulty in her marriage.

46. Mr. Lynch's prying continued during their one-on-one meetings.

47. In August of 2022, when Mr. Lynch was prying about Ms. Pawlak's personal life, she disclosed she and her husband were being treated by a couple's therapist.

48. Thereafter, Mr. Lynch frequently pried about how Ms. Pawlak's therapy sessions were going, and about her relationship with her husband, and significant portions of their weekly update calls revolved around Mr. Lynch prying into Ms. Pawlak's personal life and her mental health.

49. Under pressure, Ms. Pawlak disclosed to Mr. Lynch that she suffered from Post Traumatic Stress Disorder ("PTSD") from multiple sexual assaults 20 years prior, and that she was being treated by an individual therapist, in addition to the couple's therapist with her husband.

50. One evening in or about November 2023 while staying late at the office, Mr. Lynch asked Ms. Pawlak if her relationship with her husband was improving through couple's therapy.

51. Ms. Pawlak provided a response and Mr. Lynch continued to pry for more details.

52. When Ms. Pawlak returned to her office, her husband called her and was upset that she would be arriving home much later than originally planned. Ms. Pawlak apologized to her husband for not keeping him in the loop about her arrival time and said that she would be leaving immediately.

53. Mr. Lynch overheard the discussion between Ms. Pawlak and her husband and asked if she was alright. She replied that she was fine and left the office.

54. To Ms. Pawlak's surprise, she received a confusing text message from Mr. Lynch later that evening. Mr. Lynch thanked her for staying late to work on a specific project.

55. However, she had not stayed late to work on the project Mr. Lynch referenced. Ms. Pawlak realized that Mr. Lynch was trying to "cover" for her with her husband, fabricating a reason that she needed to stay late at the office.

56. Ms. Pawlak was puzzled by the text message, as she had no intention of lying to her husband about where she was and why she was at the office late, and she did not ask Mr. Lynch to "cover" for her.

57. Mr. Lynch later used Ms. Pawlak's disclosure about her sexual assaults and subsequent PTSD diagnosis when criticizing her performance, pointing to occasions where he alleged that Ms. Pawlak "froze up," and implied it was a symptom of her PTSD.

58. For example, Mr. Lynch often chastised Ms. Pawlak for not working on "strategy" enough, and implied that her PTSD gave her a "block" about how to move forward

with strategic projects.

59. Ms. Pawlak did not and still does not believe that her PTSD prevented her from carrying out her duties in any way. In fact, she believes that it was Mr. Lynch's poor leadership and lack of clear instructions that led to any "blocks" she encountered at DCP.

60. Further, Mr. Lynch often cut Ms. Pawlak off while she was speaking at meetings, something he noticeably did not do to other DCP employees.

61. After one such occasion, Managing Director Caitlin Currier approached Ms. Pawlak and asked if she was okay, as she found Mr. Lynch's abrupt interruption to Ms. Pawlak's presentation to be rude. Ms. Pawlak appreciated Ms. Currier's sentiment and thanked her for checking in.

62. Though Ms. Pawlak felt extremely uncomfortable by Mr. Lynch's inappropriate questions about her personal life, she did not know who to turn to in order to report the behavior.

63. After all, Ms. Pawlak was the officer responsible for handling Human Resources complaints, including onboarding, performance reviews, and day-to-day HR functions.

64. If an employee at DCP wanted to raise a claim of sexual harassment or sex discrimination, Ms. Pawlak would be the DCP manager meeting with the employee handling the complaint.

65. When Mr. Lynch harassed Ms. Pawlak, there was no one she could report the harassment to, as Mr. Lynch was the Director of the entire company.

***Lynch's shifting expectations & termination of Ms. Pawlak's employment***

66. Mr. Lynch often utilized Ms. Pawlak for random duties outside of her purview because he did not want to properly budget to hire professionals who specialize in

9

these tasks.

67. Mr. Lynch's leadership style typically involved a clear objective with no clear instructions, he simply told his subordinates to "just do it."

68. For example, instead of hiring an AV technician, Mr. Lynch assigned Ms. Pawlak, who has no AV experience, to fix technical issues throughout the office, sometimes spending several hours a week on such tasks.

69. Mr. Lynch never clearly communicated how Ms. Pawlak should prioritize her assignments and constantly shifted his performance expectations, imploring Ms. Pawlak to focus less on tasks he saw as less important, including Human Resources and Employee Personnel issues.

70. As one of the only individuals in the office four days per week, Ms. Pawlak was responsible for all sorts of administrative tasks, including stocking the kitchen, coordinating maintenance, processing mail, and depositing checks.

71. In or about April 2024, Mr. Lynch and Ms. Pawlak were discussing her role at DCP.

72. Mr. Lynch expressed that he was considering removing Ms. Pawlak's administrative responsibilities and hiring a full-time Office Administrator.

73. Mr. Lynch was concerned that if he hired a full-time Office Administrator, there would not be enough duties left in Ms. Pawlak's position description to constitute a full-time Managing Director position.

74. While Ms. Pawlak was out of the office on scheduled leave, Mr. Lynch sent her an updated version of the document he had provided her during her interview and onboarding process.

75. Mr. Lynch updated the document by crossing out responsibilities he deemed "Administrative" including Human Resources and Employee Personnel issues, asking her to think about what other responsibilities she could take on.

76. Upon information and belief, DCP did not and still has not actually hired an Office Administrator.

77. When Ms. Pawlak returned from leave on April 8, 2024, she led DCP through a transition to a new IT service provider.

78. On April 16, 2024, during a one-on-one meeting between Ms. Pawlak and Mr. Lynch, Ms. Pawlak requested additional time to review the document and provide Mr. Lynch with her thoughts about the changes to her responsibilities having been busy with the IT project.

79. At 5:14 PM that afternoon, Mr. Lynch messaged Ms. Pawlak to see if she was available for a brief telephone call.

80. During the brief call, Mr. Lynch terminated Ms. Pawlak's employment, blindsiding her.

**COUNT I**
**Violation of D.C. Code § 2-1402.11(a)(1)(A)**
**Sex Discrimination**

81. Plaintiff repeats and realleges the allegations in the foregoing paragraphs as if fully set forth herein.

82. By and through its conduct, Defendants violated the D.C. Human Rights Act when it terminated Plaintiff's employment on April 16, 2024 based on her sex (female).

83. Plaintiff's direct supervisor, Defendant Lynch, treated her differently than other employees due to her sex, by constantly shifting performance expectations of Plaintiff and making inappropriate romantic overtures to her at work.

84. The effect of this discrimination has been to deprive Plaintiff of equal employment opportunities and otherwise adversely affect her status as an employee because of her sex.

85. As a direct and proximate result of Defendants' actions, Plaintiff has suffered monetary and emotional damages.

**COUNT II**
**Violation of D.C. Code § 2-1402.11(a)(1)(A)**
**Sex Discrimination: Hostile Work Environment**

86. Plaintiff repeats and realleges the allegations in the foregoing paragraphs as if fully set forth herein.

87. At all times relevant to this Complaint, Plaintiff was a member of a protected class based on her sex, female.

88. The D.C. Human Rights Act prohibits an employer from discriminating against an employee on the basis of sex.

89. Defendants subjected its employee, Plaintiff, to a hostile work environment, beginning in or about March 2022, when Mr. Lynch began harassing Ms. Pawlak, and continuing until Defendants terminated Plaintiff's employment April 8, 2024.

90. Defendants' actions permitted severe harassment so as to create a hostile work environment for Ms. Pawlak, in violation of the D.C. Human Rights Act.

91. By and through this conduct, Defendants violated the D.C. Human Rights Act and discriminated against Ms. Pawlak on the basis of her sex.

92. Defendants' violation of the D.C. Human Rights Act was intentional, willful, and/or malicious, and were otherwise not in good faith.

93. As a direct and proximate result of Defendants' actions, Plaintiff has suffered monetary and emotional damages.

**COUNT III**
**Violation of D.C. Code § 2-1402.11(a)(1)(A)**
**Disability Discrimination**

94. Plaintiff repeats and realleges the allegations in the foregoing paragraphs as if fully set forth herein.

95. By and through its conduct, Defendants violated the D.C. Human Rights Act when it terminated Plaintiff's employment on April 16, 2024 based on her disability (PTSD).

96. Plaintiff's direct supervisor, Defendant Lynch, treated her differently than other employees due to her disability, by constantly prying into the status of her mental health issues and attributing perceived performance deficiencies to her disability.

97. The effect of this discrimination has been to deprive Plaintiff of equal employment opportunities and otherwise adversely affect her status as an employee because of her disability.

98. As a direct and proximate result of Defendants' actions, Plaintiff has suffered monetary and emotional damages.

## JURY DEMAND

Plaintiff demands a trial by jury as to all issues herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendants and award Plaintiff compensatory damages in the amount of $1,000,000.00, or such other amount as determined by the jury; back pay; front pay; the amount of tax on any award; costs; reasonable attorney's fees; and such other relief the Court may deem proper.

Dated:  October 2, 2024　　　　　　　　Respectfully submitted,

ALAN LESCHT AND ASSOCIATES, P.C.

/s/ Ari M. Wilkenfeld
Ari M. Wilkenfeld [D.C. Bar #14006]
Caroline M. Whitlock [D.C. Bar #1780939]
1825 K Street NW, Suite 750
Washington, DC 20006
(202) 463-6036
Ari.Wilkenfeld@leschtlaw.com
Caroline.Whitlock@leschtlaw.com

*Attorneys for Plaintiff*